**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KEVIN SO,                                    :
                                             :
         Plaintiff,                          :
                                             :
    v.                                       :   Civil Action No. 08-2091 (JR)
                                             :
LEONARD J. SUCHANEK,                         :
                                             :
         Defendant.                          :

**MEMORANDUM OF DECISION**

This case presents the sad story of a blind and
partially deaf retired administrative law judge who robed himself
with the made-up title "Chief Judge Emeritus"; held himself out
as a knowledgeable, indeed powerful, lawyer with experience in
complex international financial matters; undertook to provide
legal representation from Washington, D.C., to a British
corporate entity, an American investor, a wealthy but naive, non-
English speaking Hong Kong investor, and a Chinese woman resident
in Canada, in connection with a financial fraud perpetrated in
London; ignored or failed to recognize conflicts of interest
between and among these clients; accomplished roughly nothing
except administrative duties for any of them; accepted
substantial payments from his client but neither prepared nor
submitted bills; and, when his representation came to an end and
his Hong Kong client demanded the return of $400,000 of the funds
that had been entrusted to him, refused to do it.

The Hong Kong investor brought this suit, which, by the time it reached trial (without a jury), had been winnowed down to a conflict of interest claim and a prayer for equitable relief -- disgorgement of legal fees.  Disgorgement is the appropriate remedy, the plaintiff asserts, because the defendant's conflicts of interest violated his fiduciary duty to his client.  For reasons that are set forth in the findings of fact and conclusions of law that follow, I have concluded that the defendant did indeed provide conflicted representation, for a month in the summer of 2006 and for a longer period at the end of 2007.  The plaintiff did not adduce proof of damages or injury and need not have done so: a lawyer's conflicted representation of a client is enough without more to support a disgorgement remedy.  In my judgment the appropriate amount of disgorgement is the $400,000 whose return the defendant refused after the plaintiff demanded it on February 26, 2008.

### FINDINGS OF ACTS

**1.**  Plaintiff Kevin So ("So") is a citizen of the People's Republic of China and a resident of Hong Kong.

**2.**  Defendant Leonard J. Suchanek ("Suchanek") is a United States citizen and a resident of Virginia.  Amended Answer, ¶ 6.  At all times relevant to this action, Suchanek was an attorney

licensed to practice law in the District of Columbia, and maintained a law office here.  *Id.*, ¶ 8.

3.   Suchanek is a retired administrative law judge.  He served for a time as chief judge and chairman of the U.S. General Services Administration Board of Contract Appeals.  *Id.*, ¶ 2. Since his return to private practice he has assumed the made-up title of "Chief Judge Emeritus" and used it, together with "Honorable Judge," on all of his correspondence with So and others.  (Suchanek Test., Trial Tr. 65:9-16, Dec. 9, 2009 a.m.)

4.   Suchanek is blind and partially deaf.  He was assisted in his representation of So by Mira Meltzer ("Meltzer"), a non-attorney.  All of the emails Meltzer sent by or on behalf of Suchanek were either dictated by Suchanek or drafted by Meltzer and read back to Suchanek for approval before they were sent. (Meltzer Test., Trial Tr. 70:1-71:12, Dec. 9, 2009 a.m.)  Meltzer read to Suchanek all of the emails and faxes she received on his behalf, except for extremely lengthy documents (more than 200 pages) which Meltzer forwarded to Suchanek's wife for conversion to Braille.  (Meltzer Test., Trial Tr. 8:9-23, Dec. 10, 2009 a.m.)

5.   BiRui Wang ("Wang") was a business associate of So from 1994 until she emigrated to Canada in 1999.  She and her husband are friends and have remained close business and investment partners with So and his wife.  In 2004, the two couples maintained funds

in a jointly held bank account in Citibank-Hong Kong.  Wang and
So state that they were able to accumulate an investment fund of
$30 million from salaries and bonuses they received from So's
family-owned cosmetics business in the PRC over a period of
several years.  (Wang Test., Trial Tr.  48:8-14, 49:19-25,
50:13-17, Dec. 7, 2009 a.m.; So Test., Trial Tr. 7:2-25, 8:4-15,
Dec. 11, 2009 a.m.)[1]

**6.**    In 2004, So and Wang were introduced to a Chinese couple
living in Canada named Henry Yang ("Yang") and Lucy Yan Lu
("Lu").  During the fall of 2004, Yang and Lu introduced Wang and
So to a series of potential investment opportunities, (Wang
Test., Trial Tr. 52:1-53:14, 53:23-54:6, Dec. 7, 2009 a.m.), one
of which was a private placement program in London.  At the
request of the investment manager in London and the trader's
London bank (HSBC-London), So arranged to transfer the $30
million to HSBC-Hong Kong and added Lu as a signatory on the
account so that she would have authority to structure his
investment.  (Wang Test., Trial Tr. 56:13-57:19, Dec. 7, 2009
a.m.; So Test., Trial Tr. 12:6-13:3, Dec. 11, 2009 a.m.)  Lu had
no interest in the funds, and So could remove her name from the
account at any time for any reason.  (PX-387; Wang Test., Trial

---

[1]    The accumulation of $30 million from a family-owned
cosmetics business by two young people in a few years is
unexplained on this record.  It might be of considerable interest
to PRC tax or export control authorities.

Tr. 57:15-58:12, Dec. 7, 2009 a.m.; So Test., Trial Tr. 12:15
13:2, 13:14-14:8, Dec. 11, 2009 a.m.)

**7.** In February 2005, So gave Lu formal authority to execute
investment documents on his behalf.  In April 2005, Lu presented
Wang and So with a fully executed investment document between
herself and Land Base, LLC.  (PX-8, the "Land Base Agreement")
The Land Base Agreement was executed on behalf of Land Base by
Boris Lopatin ("Lopatin").  On April 20, 2005, So transferred the
$30 million from his HSBC-Hong Kong account to his new account at
HSBC-London.  (PX-9, PX-10; Wang Test., Trial Tr. 68:19-24,
Dec. 7, 2009 a.m.)

**8.** The agreement made it possible for Michael Brown to withdraw
funds from So's account and execute trades without his consent,
(PX-372, ¶¶ 18, 49), and  Michael Brown purported to do so,
paying distributions to So in May, June and August of 2005 from
what turned out to be fictitious profits totaling $3 million.  So
paid commissions on those "profits" to Lopatin and to Michael
Brown.  (PX-11; PX-12, PX-13, PX-14, PX-15)

**9.** Unbeknownst to So and Wang, HSBC learned of Michael Brown's
fraudulent activities in October 2005 and obtained an order to
freeze his accounts.  Then, in December 2005, HSBC filed a
lawsuit in the Court of Commerce in London ("UK Litigation"),
naming So, Wang and Lu as defendants (among others) and demanding

a declaratory judgment that it was not liable to them or to the other investors.  (PX – 370, ¶¶ 8, 10)

**10.**  So and Wang were not notified that they had been served in the UK until March or April 2006, when they learned that Michael Brown had been arrested and that their $30 million was no longer in the bank account at HSBC.  (Wang Test., Trial Tr. 79:22-80:4, Dec. 7, 2009 a.m.; So Test., Trial Tr. 23:1322, Dec. 11, 2009 a.m.)

**11.**  In May or June, 2006, So, Lu and Mann hired UK solicitors Kendall Freeman.  (So Test., Trial Tr. 24:3-7, 25:4-15, Dec. 11, 2009 a.m.)

**12.**  Leonard Suchanek's representation of So and Lu began in July 2006, according to an engagement letter that Suchanek issued in September.  (PX-34) ("Recovery fees, costs, and expenses were incurred during July and August . . ."))

**13.**  Lu had told Wang in March 2006 that Lopatin had introduced her to a very powerful U.S. judge who had heard about their problems and was willing to help them free of charge.  (Wang Test., Trial Tr. 76:3-5, 76:22-77:5, Dec. 7, 2009 a.m.)  Lopatin had sent Lu a copy of Suchanek's resume on March 6, 2006; Lu in turn, forwarded Suchanek's resume to Wang on March 8, 2006.  (PX-20)

**14.**  Lu met Suchanek at a meeting hosted by Lopatin in California on July 31 - August 1, 2006.  (Suchanek Test., Trial Tr.

52:9-53:6, 55:21-23, Dec. 8, 2009 a.m.)  On August 1, 2006, Lu

and Mann signed an authorization for Suchanek to provide them

with asset search and recovery services.  (PX-366)  Suchanek

understood that he would also be providing these services on

behalf of So.  (Suchanek Test., Trial Tr. 57:4-24, Dec. 8, 2009

a.m.)

**15.**  Suchanek had several extended telephone calls with Lucy Lu

on or about September 6, 2006, in which they discussed the terms

of his engagement (including an agreement that So would pay all

of the fees and expenses for Lu).  They also discussed whether

there were any conflicts between So, Lu, and Mann.  (Suchanek

Test., Trial Tr.18:7-20:8, 21:3-25, Dec. 8, 2009 p.m.)  So does

not speak English and was not a party to these discussions.

(Suchanek Test., Trial Tr. 20:9-25, Dec. 8, 2009 p.m.)[2]

**16.**  Suchanek issued an engagement letter to So and Lu on

September 10, 2006.  (PX-34)  The scope of services Suchanek

agreed to provide So and Lu included:

---

[2]     The issues and terms Suchanek discussed with Lu are
described in detail in Suchanek's diary-style billing statement.
(PX-332, pp. 2-3)  Suchanek testified that he prepared these
billing statements in Braille at the time he performed the work
described in them.  (Suchanek Test., Trial  Tr. 14:2-5, Dec. 8,
2009 p.m.; PX-332 through PX-348)  They were not transcribed from
Braille into readable text, however, until after Suchanek
terminated his representation of So (Suchanek Test., Trial  Tr.
14:6-9, Dec. 8, 2009 p.m.), and they were not provided to So
until they were produced in discovery in August 2009, nine months
after the commencement of this litigation.  (Suchanek Test.,
Trial  Tr. 14:10-12, Dec. 8, 2009 p.m.)

> "(a) recovery of money services performed after
> execution of this agreement; (b) services that relate
> to obtaining compensation and interest for the use of
> your money; (c) services that relate to recovery of any
> and all profits, as well as principal, that have been
> derived from money placed in HSBC Bank and any other
> financial organization and institution; (d) services
> that relate to obtaining compensation and damages due
> as the result of any wrong doing against you that has
> been committed by any person, firm, company,
> partnership, financial organization, and/or financial
> institution; (e) services that relate to maintaining
> and enhancing your integrity and good private and
> business reputation, (f) services that relate to
> insuring just results in any litigation; and (g) all
> services that may be required that you may wish to have
> performed."

(PX-34)

**17.** At Lu's request, So and Wang sent Suchanek $49,000 on September 14, 2006.  (Wang Test., Trial Tr. 77:18-79:10, Dec. 7, 2009 a.m.; PX-350(e)(4), p. 27)

**18.** On September 22, 2006, So and Wang sent Suchanek another $50,000.  (PX-56; Wang Test., Trial Tr. 92:25-93:20, Dec. 7, 2009 a.m.; PX350(E)(5), p. 2.)  (*See also*, PX-331, p. 12, September 12, 2006, deposit in Suchanek Accounting)

**19.** Suchanek characterized his role as limited to supporting the efforts of the UK attorneys (Suchanek Test., Trial Tr. 46:8-47:10, Dec. 16, 2009 p.m.), but his role also included his firing of Kendall Freeman and his hiring of Bivonas as So's UK solicitors, (PX-74, p. 3; PX-88); and he paid all litigation expenses via his attorney trust account (PX-41, PX62, PX-63,

PX-76), including the invoices of all of the law firms.  (PX-331, pp. 14-17)

**20.**  Earlier on July 7, 2006, Suchanek had prepared and signed an engagement letter with Land Base.  (PX-26; Suchanek Test., Trial Tr. 40:1-10, Dec. 8, 2009 a.m.)  The scope of services Suchanek agreed to provide Land Base included:

> "(b) review of documents that relate to allegations by HSBC Bank and the HSBC law firm that Land Base, LLC engaged in money laundering and/or other illegal scheme and activity allegedly shown by the Land Base, LLC, contract; (c) provision of legal advice with respect to the allegations of money laundering and/or other illegal scheme and activity . . . (f) legal assistance to Mr. Robert Mann in the effort to defend Land Base, LLC; and (g) such other legal services as may be required to defend Land Base, LLC, with respect to allegations of money laundering and/or other illegal scheme or activity."

(PX-26 (emphasis added))

**21.**  Suchanek attended a meeting in California at the end of July at the home of Lopatin's partner in Land Base, Charles Woodhead. The purpose of the meeting was to discuss the UK litigation and hear a briefing concerning the recovery of assets from Michael Brown.  Because Suchanek is blind, Lopatin asked two people to accompany him to California: Mira Meltzer ("Meltzer") and Kevin Kondas ("Kondas").  (Suchanek Test., Trial Tr. 53:9-16, Dec. 8, 2009 a.m.; Meltzer Test., Trial Tr. 96:9-18, 96:24-97:17, Dec. 9, 2009 a.m.)  Meltzer had known Suchanek since the early 1990's. From time to time, since 1993 or 1994, she had helped him with

documents and had accompanied him on trips to Mexico.  (Meltzer Test., Trial Tr. 77:8-78:6, Dec. 9, 2009 a.m.)

**22.**   Lopatin also asked Suchanek in July 2006 if he would agree to engage George Lambert as an asset recovery expert on behalf of So, Lu and  Mann.  Suchanek agreed to do so.  (Suchanek Test., Trial Tr. 46:15-49:16, Dec. 8, 2009 a.m.; 50:5-14, Dec. 16, 2009 p.m.)  On July 29, 2006, Lambert signed an agreement to provide asset search services to Suchanek and certain unnamed clients of Suchanek.  (PX-365; Suchanek Test., Trial Tr. 51:23-52:8, Dec. 8, 2009 a.m.; Lambert Test., Trial Tr. 76:24-77:25, Dec. 15, 2009 p.m.)

**23.**   On August 8, 2006, Suchanek issued a 13-page opinion letter for Land Base ("Land Base Opinion").  (PX-27; Suchanek Test., Trial Tr. 63:11-64:5, Dec. 8, 2009 a.m.)  He gave his opinion that the Land Base Agreement signed by So contained no evidence of money laundering or of any illegal scheme or activity. (PX-27, p. 11)  Suchanek was representing So at the time he issued his Land Base Opinion, (Suchanek Test., Trial Tr. 64:6-20, Dec. 8, 2009 a.m.), but he did not then consider that So had been the victim of an illegal scheme that was related to the Land Base Agreement.  (Suchanek Test., Trial Tr. 66:17-23, Dec. 8, 2009 a.m.)

**24.**   On August 9, 2006, Lopatin signed and filed a witness statement in the UK litigation. (PX-28) He attached a copy of

Suchanek's Land Base Opinion as an exhibit.  (Suchanek Test.,
Trial Tr. 7:138:11, 10:3-15, Dec. 8, 2009 p.m.)

**25.**  On August 24, 2006, Suchanek sent a letter to Lopatin
terminating his representation of Land Base, LLC.  (PX-33)
Suchanek never intended to provide any services to Land Base
other than preparing the Opinion Letter, despite his broadly
worded engagement letter.  Suchanek's termination letter to Land
Base was cc'd to Lucy Lu and Kevin So.  (PX-26; Suchanek Test.,
Trial Tr. 10:3-15, Dec. 8, 2009 p.m.)

**26.**  From sometime in July 2006 until at least August 24, 2006
(when he sent Lopatin his letter terminating his representation
of Land Base, PX-33), Suchanek simultaneously represented So, Lu,
Mann and Land Base.  (PX-26; PX-366) Suchanek billed So $39,000
for the asset search services he provided to So prior to
September of 2006.  (PX-35)  So paid these fees.  (Suchanek
Test., Trial Tr. 22:4-8, Dec. 8, 2009 p.m.)  When Lu and Mann
signed an August 1, 2006, authorization for Suchanek to provide
them with asset search services, Suchanek understood that he
would also be providing these services on behalf of So.  (PX-366;
Suchanek Test., Trial Tr. 57:4-24, Dec. 8, 2009 a.m.)  Suchanek
provided services to So and Lu in August of 2006 on both a paid
basis for asset search services, and on a *pro bono* basis for
other services.  (Suchanek Test., Trial Tr. 58:7-59:2, Dec. 8,
2009 a.m.)

27.   Article 3.11 of the Land Base Agreement contains a warranty provision that required Land Base to indemnify So if the value of So's HSBC account dropped below the value of the trading account. (PX-8, ¶ 3.11)  Suchanek's Land Base opinion specifically notes that Article 3 of the Land Base Agreement (PX-8) includes warranties between the parties.  (PX-27, p. 6)  Under D.C. Ethics Rule 1.7, Suchanek could not have advised So to pursue his warranty claims against Land Base, which fell within the scope of tasks defined by the engagement letter, without violating his obligations to Land Base.

28.   After discussions with Lucy Lu on September 6, 2006, Suchanek concluded that no conflicts existed between Lu, So, and Mann; that he would not bill So until the end of the representation; that So would be responsible for all of the fees and costs incurred by So and Lu; and that So would be charged 6/7 of the litigation expenses.  (PX-332, pp. 2-3; Suchanek Test., Trial Tr. 18:7-21:24, Dec. 8, 2009 p.m.)  Suchanek made no memorandum of those discussions.  (Suchanek Test., Trial Tr. 20:2325, 23:6-24:16, Dec. 8, 2009 p.m.)

29.   Suchanek did not perceive a conflict between Lopatin/Land Base and So/Lu in 2006 or early 2007, however.  It was not until on or about October 20, 2007, that Suchanek discovered evidence about Lopatin and Land Base which convinced him that So had claims he could assert against them.  (Suchanek Test., Trial Tr.

70:25-72:1, Dec. 16, 2009 a.m.; 14:6-21, 16:3-18:9, Dec. 16, 2009

p.m.)

**30.**   On August 21, 2007, So told Suchanek that the signature on

the August 11, 2006, witness statement was not his.   (PX-111;

PX-114; Meltzer Test., Trial Tr. 77:23-24, Dec. 10, 2009 a.m.)

On September 5, 2007, Suchanek told So he knew that Lu had  made

misrepresentations to the UK court, and that that court had

relied upon those misrepresentations in issuing an order.

(PX-125)

**31.**   Suchanek never terminated his representation of Lu.

(Suchanek Test., Trial Tr. 4:5-8, Dec. 16, 2009 p.m.)

**32.**   Suchanek represented Robert Mann as part of his

representation of Land Base.   (PX-26)   He subsequently entered

into separate engagement letters with Mann.   (PX-38; PX-112)

Bivonas, the UK solicitors, informed Suchanek on July 18, 2007,

of potential conflict between So and Mann.   (PX-108)   On

August 12, 2007, Suchanek sent a mutual indemnification agreement

drafted by Lambert as a proposal to address concerns about

conflict with Mann.   (PX110; Suchanek Test., Trial Tr.

16:10-19:2, Dec. 9, 2009 a.m.)   On October 26, 2007, Mann

terminated Suchanek's representation because of Suchanek's

conflicts of interest.   (PX-207)

**33.**   Beginning on December 27, 2006, Suchanek repeatedly informed

So that George Lambert, the asset recovery expert, had located

millions of dollars of Michael Brown's money.  (PX-54; *see also*
PX-62, p. 2; PX-63, p. 4; PX-74, p. 7; PX-76, p. 3)  So believed
Suchanek's representations.  (So Test., Trial Tr. 82:14-20,
Dec. 10, 2009 p.m.)  In fact, Lambert never located any of the
funds stolen by Michael Brown or his entities.  (Meltzer Test.,
Trial Tr. 35:1-25, Dec. 10, 2009 a.m.)  Suchanek sent So an
"Executive Report" dated August 30, 2007, asking So to pay
$2,096,922.50 in "Total Known Costs" for the litigation that was
due and payable immediately.  (PX-117)  Suchanek's cover letter
to the Executive Report said,

> "Also, and again, as I explained when we were together
> in Hong Kong, the litigation will be very expensive;
> however, it is a fact that the amount of money
> recovered, even after return of the principal that was
> lost, will far exceed the amount you spend on the
> litigation.  In this respect, I explained that the
> total value of the recovery, money and assets, is
> between 160,000,000.00 (one hundred sixty million)
> dollars and upwards to 300,000,000.00 (three hundred
> million) dollars.  But, the recovery of this size is
> totally dependent upon the financial support that makes
> possible aggressive litigation conducted by highly
> talented and highly educated experts and lawyers who
> are specially and highly qualified to achieve victory.
> This costs a lot of money because of the complexity of
> the case and the requirement to establish a litigation
> team that includes such experts and lawyers in the
> United Kingdom, the U.S., and in Hong Kong."

(PX-116, p. 2)  So responded that the amount of funds he was
requesting for litigation expenses "is so much higher than my
budget" and asked Suchanek how much of the total recovery of
$160M to $300M would be apportioned to him.  (PX-118)  Suchanek
answered that "your portion of the minimum recovery of

$160,000,000 would be a little more than $137,000,000," and that "the costs to you is very very little as compared to the amount of money that you can receive." (PX-119, p.2) So then agreed to wire Suchanek a "first payment" of $1,698,020.02 to cover expenses. (PX-120) On October 25, 2007, So (through Wang) wired Suchanek a second payment of an additional $500,000. (PX-206; PX-350(A), p.2; *see also*, Suchanek Accounting, PX-331, p. 12)

**34.** Suchanek told So that the litigation expenses itemized in his August 30, 2007, Executive Report did not include any fees for him:

- August 30, 2007, Cover Letter: "I have not included any money for me or any of my assistants in the budget because of the high cost of the litigation. The money for the litigation is much more important." (PX-116, p. 3)

- August 30, 2007, Executive Report: "Note: No money has been included in this budget for the Honorable Leonard J. Suchanek or for any of his assistants. This was done consciously because it is the conviction of the judge that it is more important to finance the litigation. The litigation costs are high and the judge in conscience could not include anything other than what has been included above and mentioned above as required costs of the litigation." (PX-117, p.6)

- September 2, 2007, email: "As I have pointed out, I have not included anything for me, or for my office and staff.  I've done this to show you that I am truly dedicated to your success and to your future."

  (PX-119, p. 2)

**35.** However, on the day Suchanek received So's first payment (September 4, 2007) he paid himself $20,000 from So's funds.  On the day Suchanek received the second payment (October 26, 2007) he paid himself $29,000 from So's funds.  During the period September 4, 2007, to November 5, 2007, Suchanek paid himself a total of $248,128.62 from So's funds.  (Suchanek Accounting, PX-331, p. 11)  Suchanek paid himself these funds without So's knowledge or consent.

**36.** Suchanek terminated his representation of So on January 31, 2008.  (Suchanek Test., Trial Tr. 25:6-10, Dec. 9, 2009 a.m.) Suchanek then instructed Meltzer to hold back $400,000 for payment of his legal fees.  (Meltzer Test., Trial Tr. 49:3-11, Dec. 10, 2009 a.m.; Wang Test., Trial Tr. 55:10-56:23, Dec. 7, 2009 a.m.)

**37.** On February 26, 2008 So wrote an email to Suchanek demanding return of the $400,000 in trust fund money, asking for an invoice detailing the legal work Suchanek performed on his behalf and requesting an update of the November 7, 2007 schedule and a complete accounting.  (PX-281)  So demanded return of his

$400,000 that Suchanek was holding in trust again on March 7, 2007.  (PX-284)  Suchanek never complied with So's request for the return of his funds.

**38.**  So's demands for an accounting and for a detailed invoice of Suchanek's services were met with excuses and delays.  (So Test., Trial Tr. 88:12-24, Dec. 10, 2009 p.m.; PX-269; PX-271 through PX-273; PX-275; PX-278; PX-281 through PX-282;  PX-284; PX-294; PX-297; PX-299; PX-300; PX-302 through PX-304; PX-307 through PX-308; PX-310; PX-316 through PX-320; PX-322 through PX-323; PX-327).  Suchanek even refused to provide the balance of funds held for So in his trust account.  (PX-309, PX-311through PX-313; PX-315 through PX-316)

**39.**  During 2008, Suchanek repeatedly moved the $400,000 back and forth between his business accounts and his personal accounts, and spent part of the money.  (PX-350(D); PX-276; PX-385; PX-301)

**40.**  Suchanek transferred what was left of So's money ($320,100.92) to So's escrow account on December 5, 2008, the day after the instant lawsuit was filed.  (PX-326)

**41.**  Suchanek never sent So an invoice during the time he represented him.  (So Test., Trial Tr. 78:15-17, Dec. 10, 2009 p.m.)  He provided no itemization of the services he had performed until after Suchanek terminated his engagement, and not until after the commencement of this litigation.  (Suchanek Test., Trial Tr. 52:1119, Dec. 16, 2009 p.m.)

**42.**  Suchanek's own accounting shows that he paid himself
$1,037,926.64 from the funds that So sent him.  (PX-331,
pp. 10-11)

## CONCLUSIONS OF LAW

In order to prove his breach of fiduciary duty claim,
So must prove that Suchanek had a fiduciary duty to him, and that
he violated that duty.  *Griva v. Davison*, 637 A.2d 830, 846-47
(D.C. 1994).  *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24
F.Supp.2d 66, 75 (D.D.C. 1998).  So must also prove proximate
cause and injury if he is seeking compensatory damages, but is
not required to demonstrate these latter elements in order to
state a claim for disgorgement of legal fees.  *Hendry v. Pelland*,
73 F.3d 397, 401 (D.C.Cir.1996).  So seeks disgorgement of legal
fees relating to Suchanek's conflicts of interest and other
breaches of fiduciary duty.

The Land Base conflict was waiveable, but Suchanek did
not give any his clients that option.  It is difficult to believe
that he did not recognize the conflict -- what he did for Land
Base was to provide a close reading and analysis of a contract
that contained a warranty provision meant to protect So.  It is
more likely that he simply tried to solve his problem with the
so-called "hot potato" treatment.

The fact that Suchanek may have represented So and Lu on a pro bono basis in August 2006 does not avoid or eliminate the existence of a conflict of interest in his representation of Land Base and So.  (Rosenfeld Test., Trial Tr. 32:16-21, Dec. 11, 2009 p.m.; Suchanek Test., Trial Tr. 54:12-19, Dec. 16, 2009 p.m.).  His retainer agreement with So and Lu (PX-34) was not, as Suchanek thought, a contract for unbundled legal services.  A contract for unbundled legal services must include a disclosure to the client that services are limited to a particular subject, and must describe the consequences resulting from the client not receiving services in the areas not covered by the contract. (Suchanek Test., Trial Tr. 63:1-2, 69:18-24, Dec. 8, 2009 p.m.; Rosenfeld Test., Trial Tr. 27:5-29:17, Dec. 11, 2009 p.m.)

This record does not demonstrate that the indemnification provision of the Land Base contract was applicable to a case of theft (rather than reduction in value), or, if it was, that So's pursuit of a warranty claim against Land Base would have been of any practical benefit to So.  Nor, as I concluded in remarks from the bench made immediately after the trial of this case, (Tr. 103-04) has plaintiff proven that Judge Suchanek understood from the beginning that So and Lu had a viable claim against Land Base and Lopatin.

"[T]he real problem that Judge Suchanek had to face was the problem of Lucy Lu and Mr. So not trusting each other."  [Tr.

104]   There came a time in August 2007 "when the friction between Lu and So reached the point that [Judge] Suchanek should definitely have withdrawn from representing one or both of them, or at the very least made plain to both of them that he was in a -- he believed that he was in a conflict situation."  He did not do so.  Instead, he tried to hold things together, for some four months, until early 2008 when it was impossible to do so any longer.  See Tr. 106-07.

    The controlling Circuit precedent found in Hendry v. Pelland, supra, amply supports a finding that a lawyer who represents his client although he has conflicts of interests has violated his fiduciary duty, and that such a violation, without more, will support an order for the disgorgement of legal fees. Hendry does not, however, require disgorgement, nor does it prescribe the amount or proportion of fees that must be disgorged if disgorgement is to be the remedy.  For those matters, the trial court is left to its sound, equitable discretion.

    In this case, the exercise of that discretion leads me to a disgorgement figure of $400,000, plus interest from the date on which So demanded the return of that amount from Judge Suchanek.  I made a rough calculation at trial of fees that were billed (or would have been billed, if Judge Suchanek had submitted bills) from September 12, 2007 through the end of the representation and came up with $115,000, see Tr. 107, but that

number does not cover fees incurred between August 21, 2007 (the date on which So told Judge Suchanek that the signature on the August 11, 2006 witness statement was not his, see PX-111; PX-114; Meltzer Test., Trial Tr. 77:23-24, Dec. 10, 2009 a.m.) and September 12, 2007, nor, upon reflection, would such an adjusted amount be a very reliable guide to the proper disgorgement remedy.  What Judge Suchanek should have done, when a demand was made for the return of money entrusted to him, was return it, immediately -- or at least put it in an independently controlled escrow account until the disagreement with his client could be sorted out.  His failure to do so, his expenditure of some of the money, and his furtive moving around of the balance, was conduct that decisively tips the balance of the equities in favor of the client.  I said at the close of the trial [Tr. 109] that I thought this was a $200,000 or $300,000 case, but, upon reflection, I find it to be a $400,000 case.[3]

A further word is necessary to say what the trial and this ruling have not decided:

So's suit originally asserted claims for malpractice, breach of contract, breach(es) of fiduciary duty, and replevin, and prayed for an accounting, disgorgement of legal fees, compensatory damages, and punitive damages.  After the suit had

---

[3]   Note that the total amount that Suchanek paid himself during the two conflicted periods note above was just about $400,000. See ¶¶ 17, 18, 35 supra.

been narrowed to one for equitable disgorgement, So asked for a ruling on his legal malpractice claims and for the appointment of a special master or a referral to a magistrate judge to "conduct any detailed factual analysis or assessment of the evidence . . . necessary to determine and quantify the damages" for those claims.  That request, made in the form of a "motion for ruling on legal malpractice claims and for appointment of special master" [#44] will be denied, as will Judge Suchanek's contingent motion for leave to file a third party complaint [#53].

On the morning of 12/8/09 (Tr. p. 30), after counsel for Mr. So confirmed that "[w]e have removed the claims in this case that are related to damages resulting from the loss of the case in the UK," I said, "Right.  The only money they want back is disgorgement of fees because of a conflict of interest.  And by the way, their malpractice case is gone too."  There was no objection to that statement.  Mr. So will be deemed to have voluntarily dismissed his malpractice claims without prejudice, see Fed.R.Civ.P. 41(a)(2).  By the same token, Judge Suchanek's counterclaim for $566,058.03, which was neither proven nor pursued at trial, will be dismissed without prejudice.  Mr. So is free to take the rest of his allegations of professional impropriety to the disciplinary organs of the D.C. Bar, and his complaints about the amount of Judge Suchanek's fees (and

possibly a claim for fraudulent inducement) to the D.C. Bar's attorney-client fee arbitration process.

Plaintiff will submit by May 14, 2010 a form of judgment awarding him the sum of $400,000, plus prejudgment interest from February 26, 2008.  Plaintiff's submission will specify the interest rate used in his calculation of prejudgment interest (citing its basis).

**SO ORDERED.**


JAMES ROBERTSON
United States District Judge